agreed to do. There is no evidence that the original agreement was ever changed, or that Nafis was authorized to do anything else than pay the mortgage. Further, the equities in these cases are very different from those in the cases cited. In Kellogg v. Ames the plaintiff took the assignment of the mortgage on representations from the owner of the equity of redemption, which would undoubtedly have estopped him from asserting the invalidity of the mortgage before the appellant, Ames, acquired any title or interest in the mortgaged premises. The same was the fact in Coles v. Appleby. But in the present cases the defendants Greene and Dunkin held their mortgage before any assignment was made to the appellants.

We do not see any force in the criticism that Kearney's testimony was inadmissible because he held the property merely for Patrick McCann. Even if we assume Kearney to have been a mere dummy, he was interested in the agreement he made with Nafis, because his liability on the bond he executed was very much affected by the question of whether it was to be a first mortgage that he was giving or a third. The property might well be of sufficient value to pay a mortgage debt of $3,000, in which case he would practically be subject to no personal liability. Therefore Nafis could not have diverted the moneys obtained on this mortgage without the consent of Kearney, even though he might obtain such authority from McCann. Of this last fact, however, there is not the slightest evidence, and no presumption to that effect should be indulged in. The plaintiffs could have called McCann as a witness, but we held on the last appeal that he was not a competent witness for the defendants, because he was the bondsman on the $1,200 mortgage.

The judgment appealed from should be affirmed, with costs.

---

(46 App. Div. 550.)

BRADLEY v. SEABOARD NAT. BANK.

(Supreme Court, Appellate Division, First Department. January 5, 1900.)

1. FRAUD—STATEMENT OF FINANCIAL CONDITION—AMOUNT OF CAPITAL.
   Statement made by a firm to a commercial agency that its capital is $500,000 is substantially correct, though its original capital was $50,000; it having at the time of the statement $450,000 more, consisting of profits, held and used by it as capital.

2. SAME—VALUE OF REAL ESTATE.
   A firm's statement to a commercial agency that its real estate in Western states was worth $122,000 is not shown false by the fact that several years later, a panic having intervened, it sold for $37,000.

3. SAME—LIABILITY AS GUARANTOR.
   Fraud cannot be inferred from the fact that a firm, whose business is largely making loans on real estate, taking mortgages therefor, and selling the mortgages, does not, in a statement to the commercial agency, mention its liability as guarantor of mortgages sold; this being merely conditional, and the real estate being at the time ample security.

4. BANKS—DEPOSITS OF INSOLVENT.
   As against liability of a bank to an insolvent for deposits, it cannot set off a note of the depositor not yet due, under Mills' Ann. St. Colo. § 187 (part of an act for administration of insolvent estates, providing: "Debts not due may be claimed, but if the same are not bearing interest a suita-

ble rebate shall be made. Interest shall be computed to date of the assignment and not afterward"); the claims not due being merely placed on an equality, for the purpose of distribution, with those due.

Appeal from trial term, New York county.

Action by Daniel Bradley against the Seaboard National Bank. From a judgment for defendant, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Jonathan C. Ross, for appellant.
Herman Aaron, for respondent.

PATTERSON, J. This cause was tried by the court without a jury, and judgment was directed for the defendant. The action was brought to recover an amount which on the 16th day of September, 1893, stood on the books of the defendant bank to the credit of Crippen, Lawrence & Co., one of its depositors. That firm did business at Denver, in Colorado, and on or about September 18, 1893, made an assignment in insolvency under the laws of that state to one Stephen H. Standard, who afterwards demanded from the defendant the amount appearing to the credit of his assignors, which demand was refused. Thereupon Standard assigned his claim against the defendant to the present plaintiff. The defendant sets up two defenses, as follows: First. That prior to September, 1893, at the request of the firm of Crippen, Lawrence & Co., it advanced to that firm the sum of $7,500; that that firm is insolvent, and was so insolvent at the time the loan or advance was made by the defendant to it; that before such advance was made that firm, for the purpose of procuring credit from the defendant and others, made and circulated through a commercial agency, with the intent and purpose of having the same communicated and come to the knowledge of the defendant, a statement of its assets and liabilities, and purporting to show its financial condition; that the defendant, before making the loan and advance, obtained that statement, and believed and relied upon it, and upon the faith thereof, and of its correctness, made the loan and advance; that the statement was false in material parts and was fraudulent; that the assets of the firm were falsely and fraudulently exaggerated; that the statements of the firm's liabilities were false and fraudulent, and that certain liabilities were falsely and fraudulently omitted therefrom and concealed, and that by reason thereof the defendant was misled and defrauded into making the loan and advance. And thereupon it claimed the right to retain the amount of the firm's deposit as an offset to the amount of the loan, upon the theory that the loan having been contracted by fraud, although it had not matured according to the terms of the contract, the defendant could rescind the transaction and make the debt presently due. Second. The other defense is that under a provision of a statute of the state of Colorado relating to insolvent assignments the defendant is entitled to offset against the deposit its undue claim against the assignor.

The evidence adduced at the trial showed that Crippen, Lawrence & Co. began their dealings with the defendant about the middle of

June, 1892, when they opened the deposit account; but previous to that date the defendant had rediscounted for the First National Bank of Salina, Kan., commercial paper of Crippen, Lawrence & Co.  Before that was done the defendant asked for a statement of the financial condition of that firm, and one was forwarded to it by the Bank of Salina.  It bears date June 1, 1891, and purports to show the condition of the firm in May, 1891.  The statement was procured from Dun's Commercial Agency, and, as would appear from the testimony of Crippen, one of the members of the firm, it was a statement authorized by that firm.  On the faith of the statement the original rediscount, which was the first in the series of transactions of the defendant in connection with mercantile paper of Crippen, Lawrence & Co., was made.  In August, 1892, the defendant discounted for that firm a note for $10,000, and that indebtedness was carried along by renewals until August 19, 1893, when $2,500 was paid on account of it, and a new note for $7,500 was given as a renewal of so much of the loan.  On September 18, 1893, Crippen, Lawrence & Co. made their assignment for the benefit of creditors, and thereunder the title to the money on deposit to the credit of Crippen, Lawrence & Co. in the defendant's bank passed to the assignee. The $7,500 note was payable 90 days after date, and therefore would not mature until November of that year.  The vice president of the defendant testifies that when the discount of the $10,000 note of Crippen, Lawrence & Co. was made by the defendant in August, 1892, and the renewal note for $7,500 was given in August, 1893, the bank relied on the truth of the statement communicated by the Salina Bank as having come through the Dun Commercial Agency of the condition of the affairs of Crippen, Lawrence & Co. in May, 1891; and he also testifies that had it been known that the firm of Crippen, Lawrence & Co. was engaged in a certain kind of business, not disclosed by the statement, neither the original discount in 1892 nor the renewal in 1893 would have been made.

It is earnestly contended by the plaintiff that there can be no legitimate relation between the statement of the condition of Crippen, Lawrence & Co.'s affairs made in 1891 and the transaction of the renewal of the note in August, 1893; there being an interval of more than two years, during which changes in the affairs of that firm must necessarily have occurred.  That the May, 1891, statement was authorized by Crippen, Lawrence & Co., is fully shown.  At the beginning of the transactions of the defendant bank with that firm it was authorized to rely upon the truth of the statement, and to base its transactions with the firm upon that statement.  Commercial agency reports relating to the financial standing and condition of those in business have become part of the ordinary business methods of the country.  Reports of such agencies are in general use for the purpose of establishing credit.  Where a dealer makes to such an agency, for the purpose of effecting a credit, a false or fraudulent representation respecting his property, and the reports become known to and are relied upon by persons giving credit on the faith thereof, the representations contained in the agency's statement have the same effect as if they were made directly by the person accredited to

the person who acts upon the faith of them. Eaton, Cole & Burnham Co. v. Avery, 83 N. Y. 31; Humphrey v. Smith, 7 App. Div. 444, 39 N. Y. Supp. 1055, and numerous cases cited by Follett, J., in the opinion of the court. That the representations contained in such statements have, to some extent, a continuing effect, has been declared. In the Humphrey Case, representations were made three months and a half prior to the date of the transaction involved in that action; in Bliss v. Sickles (Sup.) 21 N. Y. Supp. 273, there were intervals of five and eight months between the false representations and the transaction founded on them; and in Cutlery Co. v. Babcock, 22 Hun, 481, there was an interval of five months. There are cases, however, in which it is in effect held that the false representations must be proximately connected in point of time with the transaction in which the plaintiff asserts he was deceived. In Macullar v. McKinley, 99 N. Y. 353, 2 N. E. 9, Judge Danforth, in speaking for the court, and referring to the case of Eaton, Cole & Burnham Co. v. Avery, supra, states that the doctrine of that case should not be stretched. In the Macullar Case the defendant, McKinley, made a statement to Bradstreet's Commercial Agency, purporting to be as of May, 1881, respecting his pecuniary condition. The plaintiffs (merchants) sold to him merchandise in August, September, and October upon credit, which they claimed to have based upon the May statement, which was in fact made to the agency in the preceding February. Another statement was solicited from McKinley in June, 1881, but he declined to give any further information. He made an assignment for the benefit of creditors in November, 1881. In an action for deceit the court held, in substance, that the creditor was not authorized to rely upon representations made six months before the earliest sales made by them to the defendant. Under ordinary circumstances, representations of the character involved in this suit should be regarded as continuous for a reasonable time only; and they may well be considered as continuous during a series of dealings immediately connected with, or growing out of, an original transaction entered into upon the faith of such representations. Here, it would seem, according to the testimony of the vice president of the defendant as to the connected character of the transactions, that it may have been reasonable for the defendant when it renewed $7,500 of the indebtedness to rely upon the commercial agency report of May, 1891, as to the condition of the firm of Crippen, Lawrence & Co., and therefore we must inquire into the nature and substance of those representations. Upon analyzing the commercial agency report in connection with the evidence relating to the condition of Crippen, Lawrence & Co. at the time of that report, we fail to find any fraudulent intent whatever on the part of that firm in any of the representations contained in the report. From all that appears, it is a fair and honest statement of the condition of the firm. There are three subjects in respect of which fraud is claimed by the defendant, and the first relates to the amount of capital it was stated the firm then had. That capital is declared in the statement to be $500,000. It appears in the proof that when the firm was first formed its capital was but $50,000, but the evidence shows that in May, 1891, it actually had an additional

sum of $450,000, which was held and used by the firm as capital, and that it consisted of undivided and undrawn profits which belonged to the various members of the firm, and that it was treated as so much capital in the business. In that respect the statement was substantially correct. Another item of assets was real estate which is valued in the statement at $121,952.44. There is nothing in the record before us to show that the valuation of the real estate made at that time was not honest, or that the property was worth any less than that amount. Long after the failure of the firm and its insolvent assignment, this real estate was sold for $37,000. In the meantime the panic of 1893 had supervened. The real estate was situated in Western states. What it brought upon sales under such circumstances after 1893 cannot be used as evidence of its value some years before.

But it is claimed that there was a fraudulent suppression of liabilities, and an exclusion of such liabilities from the statement of 1891. It would appear that the business of Crippen, Lawrence & Co. was largely that of making loans upon real estate throughout the West, taking mortgages for such loans, and selling those mortgages. At the time the statement of 1891 was made there were about $200,-000 of such mortgages, the payment of which Crippen, Lawrence & Co. had guarantied to the purchasers of the mortgages. Between 1891 and the time of the failure of the firm that amount had largely increased. It is now asserted that it was fraud on the part of Crippen, Lawrence & Co. not to mention those liabilities in its statement. It affirmatively appears from the evidence of Mr. Crippen that the properties covered by such mortgages were worth the full amount of the mortgages. Therefore the liability incurred by them was solely conditional upon the failure of the mortgagors to pay their mortgages, or the property being sufficient to discharge those mortgages. The security was equal to the liability, and it cannot be assumed that there was any fraud under such circumstances in Crippen, Lawrence & Co. failing to make mention of such possible liability in the statement. Before any deduction of fraud can be inferred in this case, the intent to defraud must be made in some way satisfactorily to appear. The record is devoid of any proof from which that inference can fairly be drawn. We do not find anything which authorized the defendant to rescind the transaction resulting in the renewal note of $7,500 in August, 1893. No representation of any kind was made by Crippen, Lawrence & Co. to the Seaboard National Bank between June, 1892, and August, 1893, and the statement of May, 1891, is not successfully impeached in any of the respects in which it has been attacked.

Concerning the second ground upon which the defendant seeks to offset Crippen, Lawrence & Co.'s indebtedness against the plaintiff's claim, it is sufficient to say that the provision of the statute of the state of Colorado relied upon does not relate to the subject of set-off, and gives no other or further right of set-off than would exist at common law. The debt to the Seaboard National Bank was not due when the assignment for the benefit of creditors was made, and, upon

the well-understood rule of law, could not be set off against it. The provision of Mills' Ann. St. reads as follows:

"Section 187. Debts not due may be claimed, but if the same are not bearing interest a suitable rebate shall be made. Interest shall be computed to the date of the assignment and not afterward."

This section is a part of the provisions of chapter 34 of the Session Laws of Colorado of the year 1893, which went into effect on April 8, 1893; and it evidently refers only to administration of estates under the general provisions of an insolvent law, and is intended only to place holders of undue debts on an equality, in proving claims for dividends, with the holders of matured debts under an assignment for the benefit of creditors. By section 171 of the same statute preferences to creditors are forbidden. All are to share in proportion to the amount of their respective claims. An assignee for the benefit of creditors is by section 175 required forthwith upon an assignment being made to publish notice of claims, and to give notice to creditors to present their claims under oath within three months from the filing of the notice; and it declares that claims filed within those three months shall have priority over those filed thereafter, unless a proper excuse is given, to the satisfaction of the court or judge acting in the assignment proceeding. That is all the legislation brought to our notice respecting the status of holders of undue claims. They simply come in as if they held claims that were due, and for the purposes of distribution of the assets upon the basis of equality between debts due and debts not due. It requires something more than such provisions to authorize us to conclude that a new rule of set-off was introduced into the law in Colorado. and which would affect the rights of the parties to this action.

The judgment must be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.

VAN BRUNT, P. J. I concur in the result. Even if the representations were false, the defendant could not avail itself of them. They were too remote.